# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

TINA BRYANT,

       Plaintiff,

    vs.                          **Case No. 09-4159-RDR**

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

       Defendant.

---

## MEMORANDUM AND ORDER

On July 12, 2005, plaintiff filed an application for social security disability insurance benefits. This application alleged a disability onset date of June 16, 2005. On August 14, 2007, a hearing was conducted upon plaintiff's application. The administrative law judge (ALJ) considered the evidence and decided on September 13, 2007 that plaintiff was not qualified to receive benefits. This decision has been adopted by defendant. This case is now before the court upon plaintiff's motion to reverse and remand the decision to deny plaintiff's application for benefits.

I. STANDARD OF REVIEW

To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the claimant had "insured status" under the Social Security program. See Potter v. Secretary of Health & Human Services, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131. To be "disabled" means that

the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards.  Rebeck v. Barnhart, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004).  "Substantial evidence" is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id., quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the defendant's decision.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human Services, 933 F.2d 799, 800-01 (10th Cir. 1991)).  The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to the court de novo.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).

II.  THE ALJ'S DECISION (Tr. 15-27).

There is a five-step evaluation process followed in these cases which is described in the ALJ's decision.  (Tr. 16-17). First, it is determined whether the claimant is engaging in substantial gainful activity.  Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe."  At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  Next, the ALJ determines the claimant's residual functional capacity and then decides whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work.  Finally, at the last step of the sequential evaluation process the ALJ determines whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.

In this case, the ALJ decided plaintiff's application should be denied on the basis of the fifth and last step of the evaluation process.  The ALJ decided that plaintiff maintained the residual functional capacity to perform jobs that existed in significant numbers in the national economy.

The ALJ made the following specific findings in his decision. First, plaintiff last met the insured status requirements for

Social Security benefits on December 31, 2006. Second, plaintiff did not engage in substantial gainful activity from June 16, 2005, the alleged onset date of disability, through the date last insured. Third, through December 31, 2006, plaintiff had the following severe impairments: right ankle fracture with surgery and hardware insertion and facial surgeries in 1998; status-post excision of a bone cyst of the right distal fibula and right distal tibia in 2005; status-post excision of the osteophyte in the right distal tibia in 2006; a cognitive disorder (NOS); a post-traumatic stress disorder (PTSD); and depression.[1] Fourth, plaintiff did not have an impairment or combination of impairments that met or medically equaled the Listed Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Fifth, plaintiff had the residual functional capacity to perform:

> a range of light work, or work requiring lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, sitting 6 hours in an 8-hour workday, and standing and/or walking 2 hours in an 8-hour workday, alternating from sitting to standing every 30 minutes. [Plaintiff] could not perform work requiring climbing ladders/rope/scaffolds, and should avoid exposure to temperature/humidity extremes, vibration, or irritants. In addition, [plaintiff] is able to understand, remember, and carry out simple instructions consistent with unskilled work, but could not perform work requiring significant interaction with the general public or work around a large group of co-workers, 4 or over.

---

[1] The ALJ did not find that plaintiff had a severe anxiety disorder. However, as is noted later in this opinion, several medical sources stated that plaintiff suffered from anxiety or an anxiety disorder.

4

(Tr. 19). Sixth, plaintiff was unable to perform any past relevant work. But, seventh, plaintiff was capable of performing jobs that existed in significant numbers in the national economy, such as: a bonder of semi-conductors; a surveillance systems monitor; and an addresser. (Tr. 26). This last finding was based upon the testimony of a vocational expert, and the ALJ considered plaintiff's age, education, work experience and residual functional capacity.

III. EVIDENCE IN THE RECORD

Plaintiff's claim for benefits asserts that she is disabled because of depression, anxiety and right ankle difficulties. Plaintiff has also been diagnosed with PTSD. With this in mind, the court shall review some of the evidence in the record.

Plaintiff was born in 1966. She has a GED. Plaintiff was involved in a severe motor vehicle accident in 1998 which caused broken bones in her face and right leg, and several surgeries upon her face and right leg. She was considered disabled from May 27, 1998 to October 1999. Plaintiff worked some jobs after October 1999. Her last employment was as a personal care attendant for a mentally impaired uncle. This job apparently ended on or before June 16, 2005, the alleged onset date of disability, because the ALJ determined that plaintiff had not engaged in substantial

gainful employment after that date.[2]  Because plaintiff's insured status lapsed after December 31, 2006, plaintiff's condition between June 16, 2005 and the end of December 2006 is what is most relevant to the claims in this case.

Right ankle treatment by Dr. Ogden

Plaintiff made complaints of lower right leg pain in July 2005. (Tr. 165 & 229).  After x-rays, Dr. J.T. Ogden diagnosed plaintiff as having: traumatic arthritis of the right ankle; exostosis and pseudarthrosis of the right distal tibiofibular syndesmosis with pain; and plantar valgus deformity of the right foot and ankle. (Tr. 229).  Plaintiff had surgery by Dr. Ogden on July 21, 2005 for a bony exostosis (a bone cyst) from the right distal tibia.  In August 2005, Dr. Ogden noted that plaintiff was doing well after the surgery.  (Tr. 225-26).  He stated that plaintiff had range of motion of her ankle but complained of some stiffness and pain.  On September 13, 2005, Dr. Ogden completed a form so that plaintiff could receive a permanent disabled parking placard.  (Tr. 157).  Dr. Ogden marked on the form that plaintiff was "severely limited in [her] ability to walk at least 100 feet due to an arthritic, neurological, or orthopedic condition."

_____

[2] Plaintiff testified before the ALJ that her last job ended in 2004.  (Tr. 425-26).  However, she reportedly said during an evaluation by Dr. Darwin Anderson that she last worked in July 2005.  (Tr. 234).

Also, in September 2005, Dr. Ogden noted that plaintiff still had some intermittent pain in the ankle, although the incision was well-healed and good range of motion was present. Plaintiff was advised to discontinue an air cast and to use some over-the-counter orthotics in her shoes. (Tr. 310).

In October 2005, plaintiff complained to Dr. Ogden of increased pain in her right ankle. Upon examination the ankle appeared normal and there was excellent range of motion without instability. However, there was "palpable tenderness" along the ankle joint. (Tr. 309).

A year later, in October 2006, Dr. Ogden continued to diagnose plaintiff with "traumatic arthritis right ankle." He also diagnosed plaintiff with "[p]ainful osteophyte right distal tibia." An osteophyte is a bone spur. Again, Dr. Ogden recommended orthotics. On November 30, 2006, Dr. Ogden performed an excision. He commented on December 15, 2006 that plaintiff was doing well and was "improving in regards to the pain." (Tr. 306). Plaintiff asked for pain medications which were agreed to by Dr. Ogden.

Right ankle evaluation by Dr. Komes

Dr. Kevin Komes evaluated plaintiff on November 3, 2005. He reported that plaintiff was having "progressive pain with attempted ambulation and underwent removal of osteophytes at the ankle in July." (Tr. 250). He further related that plaintiff "states that she cannot stand or walk for prolonged periods of time." (Tr.

7

250).  Dr. Komes concluded that plaintiff was in "mild distress" and walked with an "antalgic gait on the right side."  (Tr. 250).  He added:

> She tries to avoid weight bearing on the right.  There is swelling and warmth noted in the right ankle.  It is markedly tender to palpation.  There is no instability to anterior drawer testing.  Motion is essentially ankylosed between zero and five degrees of plantar flexion.

(Tr. 250).

Dr. Komes made the following conclusions regarding plaintiff's physical capacity:

> [Plaintiff] should have no difficulty with sitting.  She may have difficulty with standing more than 5 or 10 minutes at a time.  Assistive device may be necessary to ambulate more effectively.  Walking would be limited to 15 minutes continuously, otherwise.  She would have difficulty lifting or carrying more than 10 to 15 lb. at a time.

(Tr. 251).

### Dr. Abu-Libdeh

Plaintiff visited a rheumatologist, Dr. Ali Abu-Libdeh, on February 21, 2006 because of pain and swelling in both hands.  Records of this visit show that plaintiff reported her right ankle was "practically asymptomatic."  (Tr. 261).

### Dr. Burden

Plaintiff's primary care physician has been Dr. Tyson Burden.  His records show that plaintiff has reported various mental and physical impairments to him during 19 visits between August 2004 and April 2007.  Plaintiff did not complain of right ankle pain

during most of those visits.  However, the records reflect that plaintiff did complain of right ankle pain on July 7, 2005 and September 25, 2006.

Plaintiff complained of anxiety and/or depression during 13 of the 19 visits to Dr. Burden, although for almost half the visits Dr. Burden noted that plaintiff exhibited good mood and affect.

Dr. Burden completed a mental assessment form regarding plaintiff on September 20, 2006.  (Tr. 263-64).  Dr. Burden indicated that plaintiff had a "marked" limitation in her ability to handle normal work stress.  He further indicated that plaintiff had moderate limitations in the following activities:

The ability to remember locations and work-like procedures.

The ability to understand and remember simple instructions.

The ability to understand and remember detailed instructions.

The ability to maintain attention and concentration for extended periods in order to perform simple tasks.

The ability to maintain attention and concentration for extended periods in order to perform detailed tasks.

The ability to adhere to a schedule and maintain regular attendance.

The ability to work close to others without being distracted.

The ability to accept instructions and criticism from supervisors.

The ability to work with others without causing distractions.

He said that plaintiff had "slight" limitations in her ability: to maintain socially appropriate behavior; to interact with the public appropriately; and to perform at a consistent pace. On a second form, Dr. Burden identified that plaintiff exhibited: memory difficulties; persistent irrational fears; generalized persistent anxiety; and difficulty concentrating or thinking. (Tr. 265).

Dr. Burden frequently diagnosed plaintiff with anxiety and depression and frequently prescribed medication such as Xanax and Cymbalta. His records also indicate that he gave counseling to plaintiff on different occasions. (Tr. 164, 316, 319).

Pamela Anderson

Pamela Anderson is a licensed specialist clinical social worker who counseled plaintiff because of her depression and anxiety 20 times between October 25, 2005 and July 11, 2007. Each session was approximately 50 minutes.

Anderson indicated that during visits in February, April and May 2006, plaintiff reported or exhibited pain. (Tr. 399, 400, 404). For instance, in February 2006, Anderson recorded that plaintiff "was obviously in physical pain today and had difficult[y] moving and finding a comfortable way to sit in my office." (Tr. 404). Mostly, Anderson focused upon plaintiff's mental and emotional problems. There are ten reports from sessions in 2006. Almost every one of those reports states that plaintiff said she was suffering increased depression and/or anxiety. (Tr.

389-406).

Anderson completed two assessments of plaintiff's mental functioning. In the first report (Tr. 252-53), dated December 6, 2005, Anderson reported "marked" limitations in the following activities:

> The ability to maintain attention and concentration for extended periods in order to perform detailed tasks.
>
> The ability to adhere to a schedule and maintain regular attendance.
>
> The ability to work close to others without being distracted.
>
> The ability to perform at a consistent pace without an unreasonable number or length of rest periods.
>
> The ability to handle normal work stress.
>
> The ability to interact appropriately with the public.
>
> The ability to accept instructions and criticism from supervisors.

Anderson further reported "moderate" limitations in plaintiff's ability: to understand and remember detailed instructions; to maintain attention and concentration for extended periods to perform simple tasks; to work with others without causing distractions and to maintain socially appropriate behavior.

Anderson's second assessment (Tr. 409-10), dated August 10, 2007, was only slightly different from her first assessment. Plaintiff's ability to accept instructions and criticism from supervisors was listed as "moderate" instead of "marked," and plaintiff's ability to remember locations and procedures and to

understand simple instructions was listed as "moderate" instead of "slight."

Dr. Darwin Anderson

Dr. Darwin Anderson is a licensed psychologist who evaluated plaintiff on October 24, 2005.  He diagnosed plaintiff with: anxiety disorder not otherwise specified; depression not otherwise specified, and cognitive disorder not otherwise specified.  His impressions of plaintiff included the following discussion:

> [Plaintiff] reported that she is unable to work due to emotional symptoms that interfere with her functioning most days, pain and functional limitations associated with a recently repaired fracture in her right leg, impaired concentration, and recurrent headaches.  Her allegations regarding significant emotional symptoms appear credible.  Additionally, while she gave fairly strong performances on concentration-related mental status examination tasks, her responses were much slower than expected and she appeared to struggle to maintain focus.
> . . . .
>
> [Plaintiff] has significant anxious symptoms, including trauma-related symptoms, panic symptoms, and generalized anxiety symptoms.  She reports a persistent depressed mood and suicidal thoughts.  While her emotional distress may be interfering with her cognitive functioning, her very low performances on memory-related mental status examination tasks are suggestive of some degree of cognitive impairment, most probably due to the head trauma.
>
> . . . .
>
> [Plaintiff's] current intellectual functioning is adequate to learn simple, repetitive tasks within acceptable amounts of time.  However, her current cognitive functioning and emotional status may preclude learning even mildly complex tasks at this time.  Based upon clinical observations and her performances on concentration-related mental status examination tasks,

her capacity for concentration is generally adequate to maintain focus upon simple tasks over a normal 8-hour workday. However, at times when her emotional status is more compromised and/or she is experiencing increased physical discomfort, her capacity for concentration may be more impaired. [Plaintiff's] responses to social reasoning questions and explanations for proverbs indicate that she is able to consistently make simple, work-related mental status examination tasks and clinical observations, both shorter-term and longer-term memory capacities are significantly impaired. Therefore, she will currently do best at tasks that are most repetitive in nature. Additionally, she probably cannot be relied upon to remember frequent changes in job tasks. [Plaintiff] reported that she is often uncomfortable in groups of more than 3 to 4 people. However, she interacted appropriately during this evaluation and reported that she attends church where there are likely more than 3 to 4 people present. Therefore, [plaintiff] is able to function in work environments where she works mostly independently or with a small group of coworkers. However, she likely will have difficulties in work environments where there are many coworkers and/or a significant amount of contact with the general public is required. [Plaintiff] reported that 3 to 4 days per week, she is so emotionally distressed that she "can't function." Therefore, her ability to keep a regular work schedule is apparently currently compromised to some degree by her emotional distress. However, based upon her self-report, as recently as July, she was apparently able to maintain a regular work schedule.

(Tr. 238-40). Dr. Anderson also noted that plaintiff appeared to walk "fairly normally," but requested a footstool and sat with her right leg extended after approximately 30 minutes. (Tr. 236).

<u>State agency psychologists</u>

The ALJ agreed with the opinions of the state agency medical psychologists who did not examine plaintiff, but who reviewed plaintiff's medical records. (Tr. 18). The state agency medical psychologists concluded that plaintiff had moderate limitations in

her ability to maintain concentration, persistence or pace and the ability to understand or carry out detailed instructions. (Tr. 276, 282). They found only mild restrictions in plaintiff's activities of daily living and social functioning. (Tr. 276, 282). They found no "marked" limitations. They concluded that plaintiff was capable of performing simple, routine tasks in a work setting without many people. (Tr. 278, 284).

### State agency medical consultants

The ALJ agreed with the opinion of the state agency medical consultants (Tr. 289-295, 296-305) who determined that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for at least 2 hours in an 8-hour workday; and sit for a total of about 6 hours in an 8-hour workday. The consultants found that plaintiff should only occasionally climb stairs, stoop, kneel, crouch or crawl and never attempt to balance on something.

IV. PLAINTIFF'S ARGUMENTS

Plaintiff's first two arguments are: 1) that the ALJ's finding that plaintiff's impairments do not meet a Listed Impairment is not supported by substantial evidence; and 2) that the ALJ failed to properly consider the medical sources' opinions. The court shall consider these two arguments together because Tenth Circuit case law permits the court to consider an ALJ's findings as a whole in determining whether an ALJ's findings with regard to Listed

14

Impairments are properly supported. See <u>Fischer-Ross v. Barnhart</u>, 431 F.3d 729, 734 (10th Cir. 2005).

<u>Listing 1.02</u>

The first part of plaintiff's argument regarding Listed Impairments asserts that plaintiff's ankle impairment satisfies the criteria of Listed Impairment 1.02 and that the ALJ's general finding to the contrary is not supported by substantial evidence. Listing 1.02 provides that there is a presumptive finding of disability if there is a major dysfunction of the ankle joint resulting "in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt.P, App. 1, § 1.02A.

"Inability to ambulate effectively, as defined in 1.00B2b" means:

> (1) . . . an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

> (2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and

15

the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt.P, App. 1, § 1.00B2b.

While the ALJ did not discuss Listing 1.02 specifically, he explicitly found that plaintiff did not have an "'extreme' limitation in the ability to walk effectively as defined in 1.00B2b." (Tr. 18). Plaintiff argues that the ALJ failed to explain why he determined that plaintiff could ambulate effectively. Plaintiff notes that: she uses a scooter when she shops at Wal-Mart; that Dr. Komes stated that plaintiff's continuous walking would be limited to 15 minutes and that an assistive device might be necessary to ambulate more effectively; and that Dr. Ogden indicated that plaintiff was severely limited in her ability to walk.

The ALJ's decision refers to Dr. Komes' examination and his conclusion that plaintiff can walk for only 15 minutes continuously. (Tr. 21). It appears to the court that the ALJ decided that plaintiff could ambulate effectively because plaintiff was able to return to work for several years after the 1998 motor vehicle accident which fractured her ankle and that the ankle surgeries in 2005 and 2006 were followed by mostly positive healing reports. The ALJ further stated that he agreed with the physical functional capacity assessments made by state agency consultants

who concluded that plaintiff could perform a range of light work. (Tr. 19). These assessments made direct reference to parts of Dr. Komes' opinion. (Tr. 294, 297-98). They also made reference to Dr. Abu-Libdeh's comment in February 2006 that plaintiff's ankles were unremarkable (Tr. 298), and to Dr. Ogden's prognosis of expected progress in August 2005. (Tr. 293, 301).

The ALJ did not explicitly mention Dr. Ogden's comment upon the application for a permanent disabled parking placard. However, the ALJ is not obliged to discuss every piece of evidence in his decision. Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996). In this instance, the court does not believe Dr. Ogden's statement is so probative as to require discussion.

Plaintiff cites the Clifton decision in support of her attack upon the ALJ's analysis of whether plaintiff had a Listed Impairment. The ALJ's analysis of the Listings of relevant physical impairments, such as Listing 1.02, is not expansive. But, it is more than was found deficient in Clifton, 79 F.3d at 1009, where the ALJ did not identify the relevant listings, discuss reasons for his findings, and merely rendered a summary conclusion.

After careful review, the court finds that the ALJ's conclusion that plaintiff can ambulate effectively for the purposes of the Listed Impairments is supported by substantial evidence and adequately explained by the ALJ.

<u>Listings 12.02, 12.04 and 12.06</u>

Plaintiff also challenges the ALJ's findings that plaintiff's mental impairments did not meet Listings 12.02, 12.04 or 12.06. The ALJ determined that plaintiff's impairments did not meet or equal these listed impairments because they did not satisfy the "paragraph B" or "paragraph C" criteria relating to those Listings. For the purposes of this opinion, the court need only consider whether substantial evidence supports the finding that the "paragraph B" criteria were not satisfied.

Plaintiff contends that the ALJ did not adequately support his finding that the "paragraph B" criteria are not satisfied by this record. To satisfy the "paragraph B" criteria, it must be concluded that plaintiff's mental impairments result in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social function-ing; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt.P, App. 1, §§ 12.02B, 12.04B, 12.06B.

Plaintiff contends the record demonstrates that plaintiff has a "marked" limitation in her activities of daily living and social functioning.

A "marked" limitation is "more than moderate but less than extreme." 20 C.F.R. Pt. 404, Subpt.P, App. 1, § 12.00C. "A marked

18

limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the] ability to function independently, appropriately, effectively, and on a sustained basis." Id.

"Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt.P, App. 1, § 12.00C1. The level of limitation is determined by the capability of "initiating and participating in activities independent of supervision or direction." Id.

"Social functioning refers to [the] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. [One] may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. [One] may exhibit strength in social functioning by such things as [one's] ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group

activities." 20 C.F.R. Pt. 404, Subpt.P, App. 1, § 12.00C2.

The ALJ relied upon the opinions of the State agency medical psychologists in finding that the "paragraph B" criteria were not satisfied. But, the ALJ did not discuss any evidence relating to plaintiff's activities of daily living or social functioning in the "Listings" portion of his decision. In the remainder of his decision, the ALJ did discuss the psychological evaluations of other medical sources. He acknowledged the diagnoses of depression, anxiety disorder and cognitive disorder by Dr. Anderson, and that Dr. Anderson assigned a GAF score of 50 to plaintiff.[3] The ALJ noted that plaintiff told Dr. Anderson that she became so emotionally distressed at times that she could not function for 3 or 4 days per week. The ALJ seemed to discount this because the evaluation occurred in late October 2005 and, according to Dr. Anderson, plaintiff had been able to maintain a regular work schedule in July 2005.[4] It should be remembered, however, that

---

[3] The GAF (Global Assessment of Functioning) "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Pollard v. Halter, 377 F.3d 183, 186 n.1 (2nd Cir. 2004). A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational or school functioning, such as the inability to keep a job. See Langley v. Barnhart, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004); Hall v. Astrue, 677 F.Supp.2d 617, 622 n.3 (W.D.N.Y. 2009).

[4] As already mentioned, this apparently was the date reported by plaintiff to Dr. Anderson during an evaluation (Tr. 240) and this date is referred to in the ALJ's decision (Tr. 20, 22). But, the ALJ concluded that plaintiff had not worked since at least June 16, 2005. (Tr. 17).

plaintiff's last job was providing personal care for her uncle (which does not seem like a position requiring much social contact) and that the ALJ determined that plaintiff was disabled from returning to her previous employment.

The ALJ also discussed Dr. Burden's evaluation of plaintiff's mental functioning, noting that he determined that plaintiff had a marked limitation in her ability to handle normal work stress and moderate limitations in several other areas of mental functioning, including the ability to work with or be supervised by others. The ALJ noted that Dr. Burden sometimes found that plaintiff was in a good mood and had a good affect and that he linked plaintiff's complaints of increased depression and anxiety to deaths in plaintiff's family.

However, the ALJ does not point to evidence suggesting that plaintiff's mental condition improved with the passage of time (as plaintiff recovered from her bereavement) or that plaintiff's depression was less real or significant whatever its cause. It should also be noted that the ALJ did not accept Dr. Burden's evaluation of plaintiff's mental functioning capacity, although Dr. Burden was plaintiff's personal physician who treated or examined plaintiff 19 times, often when plaintiff complained of depression. When the ALJ asked the vocational expert in this case whether plaintiff could perform substantial gainful employment under the limitations recorded in Dr. Burden's assessment, the expert

answered "no."  (Tr. 449).

Finally, the ALJ acknowledged the opinions of Pamela Anderson, the licensed clinical social worker who spent far more time counseling, addressing and evaluating plaintiff's mental functioning than any other medical source.  The ALJ noted that Ms. Anderson determined that plaintiff had a marked limitation in most areas of attention and concentration.  Ms. Anderson also concluded that plaintiff had a marked limitation in her ability to interact with the public and accept instructions and criticism from supervisors.  The ALJ stated, however, that Ms. Anderson, as a social worker, could not give an opinion which was entitled to "controlling weight."  (Tr. 22).  He further said that her assessments were not consistent with her treatment notes "which indicate that [plaintiff's] anxiety and depression were increasing due to her demanding family, and she was encouraged to continue to limit contact with her family." (Tr. 22).  The ALJ remarked that Dr. Burden assessed plaintiff as having greater functional capabilities than Ms. Anderson's assessment.  He also noted that plaintiff had not been taking Xanax as often as recommended. Finally, the ALJ again mentioned that Dr. Anderson referred to plaintiff's previous work in July 2005 where she performed such activities as taking her uncle to appointments, managing his medications, preparing meals and managing his colostomy bag.  For all of these reasons, the ALJ concluded that Pamela Anderson's

mental assessments should not be given substantial or controlling weight.

The court finds that substantial evidence does not support the ALJ's findings with regard to Listings 12.02, 12.04 and 12.06 for the following reasons.

First, the ALJ did not explain why plaintiff's mental impairments do not meet the criteria of "paragraph B" other than to say that he agreed with the opinions of the State agency medical psychologists who never examined plaintiff.

Second, the opinions of non-examining physicians or psychologists are not entitled to great weight. Social Security regulations provide that, generally, treating sources are given more weight than non-treating sources, and examining sources are given more weight than non-examining sources. 20 C.F.R. § 404.1527(d)(1)&(2). The Tenth Circuit has said that it has "long held that 'findings of a nontreating physician based upon limited contact and examination are of suspect reliability.'" McGoffin v. Barnhart, 288 F.3d 1248, 1253 (10th Cir. 2002) (quoting Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987)). The Tenth Circuit has described the gradation of authority accorded to medical opinions as follows:

> The opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant. The treating physician's opinion is given particular weight because of his unique perspective to

the medical evidence that cannot be obtained from the
objective medical findings alone or from reports of
individual examinations, such as consultative examin-
ations or brief hospitalizations. The opinion of an
examining physician is generally entitled to less weight
than that of a treating physician, and the opinion of an
agency physician who has never seen the claimant is
entitled to the least weight.

Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004) (interior

citations and quotations omitted). In this case, the ALJ appeared

to give more weight to the assessment of the non-examining

psychologists than to the assessment of plaintiff's treating

physician.[5]

Third, the ALJ did not give appropriate weight to the findings

of Pamela Anderson. The ALJ was correct that, under Social

Security regulations, the opinion of a licensed social worker is

not entitled to controlling weight. 20 C.F.R. § 404.1513(a).

Under those regulations Ms. Anderson, as a licensed clinical social

worker, is not an "acceptable medical source." Id. However, the

regulations require that the ALJ give consideration to the opinions

of licensed social workers and other professionals that help "show

---

[5] Defense counsel makes arguments to diminish the weight
attached to Dr. Burden's assessment of plaintiff's mental
capability to work. Doc. No. 18 at pp. 8-9. These arguments,
however, were not made by the ALJ. We must evaluate the ALJ's
decision on the basis of the reasons stated within the decision.
Grogan v. Barnhart, 399 F.3d 1257, 1263 (10th Cir. 2005); Robinson
v. Barnhart, 366 F.3d 1078, 1084-85 (10th Cir. 2004). "Affirming
[a] post hoc effort to salvage the ALJ's decision would require us
to overstep our institutional role and usurp essential functions
committed in the first instance to the administrative process."
Robinson, 366 F.3d at 1084-85 (quoting Allen v. Barnhart, 357 F.3d
1140, 1142 (10th Cir. 2004).

the severity of [an] impairment and how it affects [a claimant's] ability to work." 20 C.F.R. § 404.1513(d). As discussed in SSR 06-03p:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Indeed, it has been commented that "[b]ased on the particular facts of a case, such as length of treatment, it may be appropriate for an ALJ to give more weight to a non-acceptable medical source than a treating physician." Anderson v. Astrue, 2009 WL 2824584, at *9 (E.D.N.Y. 8/28/2009); see also, SSR 06-03p.

Here, the ALJ did not dismiss Pamela Anderson's assessments without discussion. But, the ALJ's reasons for dismissing her assessments are not persuasive, nor do they credit Ms. Anderson's lengthy treatment history with plaintiff. The ALJ stated that Ms. Anderson's assessments are not consistent with her treatment notes which indicate that plaintiff's anxiety and depression were increasing due to her demanding family and that plaintiff was encouraged to continue to limit contact with her family. The inconsistency is not clear to the court. That plaintiff's family difficulties exacerbated her problems with depression and anxiety

does not rebut her claims of disability. The advice that plaintiff limit family contact may have been ineffective for a variety of reasons or not executed for some reason. It does not indicate that Ms. Anderson's assessments of plaintiff's condition are inconsistent with her treatment notes. The ALJ suggested that plaintiff was not taking Xanax in sufficient frequency. But, the ALJ does not cite a record or an opinion which indicates that more effectively delivered medication would correct plaintiff's depression and anxiety. The ALJ noted that Dr. Burden's assessments were not as restrictive as Ms. Anderson's assessments. However, the ALJ did not acknowledge that under Dr. Burden's assessments, the vocational expert testified that plaintiff would be disabled from substantial gainful employment. The ALJ referred to Dr. Darwin Anderson's examination and suggested that it was inconsistent with Pamela Anderson's assessments. Dr. Anderson gave plaintiff a GAF score of 50 on October 24, 2005. Pamela Anderson gave plaintiff a GAF score of 45 on October 25, 2005. Both scores reflect serious impairments in mental functioning. The ALJ remarked that Dr. Anderson found that plaintiff could learn simple, repetitive tasks. However, this is not inconsistent with Pamela Anderson's assessments of plaintiff's abilities. Finally, the ALJ noted that plaintiff had been able to work for two years and as late as July 2005 providing independent-living assistance for her psychologically disabled uncle, and that plaintiff performed

activities such as taking him to appointments, managing his medications, preparing meals and managing his colostomy bag. In making this remark, the ALJ does not explain how this is inconsistent with Pamela Anderson's assessments of plaintiff's functional capacity in October 2005 or after. Moreover, the ALJ found that plaintiff could not return to that line of work, and multiple entries in the record suggest that plaintiff's symptoms of depression grew worse. In addition, the ALJ does not attempt to decide what caused plaintiff to leave the care of her uncle. The record is unclear whether plaintiff's mental impairments caused her to leave or whether there was some other cause.[6]

In sum, there are two medical sources in the record who had extensive contact and mental health treatment experience with plaintiff. Based upon Dr. Burden's assessment of plaintiff's inability to handle stress, the vocational expert testified that plaintiff could not perform substantial gainful employment. Pamela Anderson concluded that plaintiff's mental limitations were even greater than what Dr. Burden found. The vocational expert testified that there were no jobs plaintiff could perform under those restrictions as well. (Tr. 450). However, for no convincing reason the ALJ gave greater weight to the mental health assessments

---

[6] Plaintiff has stated that she became afraid of her uncle. (Tr. 246 & 278). She has stated that he fired her and that she had a breakdown. (Tr. 426). She has stated that she quit because of problems with her right leg. (Tr. 235). She also has stated that she has been disabled since May 2005 because of PTSD. (Tr. 261).

of state agency psychologists who never examined plaintiff. This is contrary to Tenth Circuit case law regarding the consideration of evidence and opinion from medical sources. This flaw in the analysis of the record leads this court to conclude that the ALJ's findings with regard to Listed Impairments 12.02, 12.04 and 12.06 are not supported by substantial evidence and that the ALJ failed to properly consider medical sources evidence in the remainder of his opinion.

Plaintiff's remaining arguments

Plaintiff also argues that the ALJ's finding that plaintiff is not credible in some respects is not supported by substantial evidence and that the ALJ's finding that there are a significant number of other jobs which plaintiff can perform is not supported by substantial evidence. The court shall not reach these issues because a remand for reconsideration of the medical sources evidence may lead to a different assessment of plaintiff's credibility and of plaintiff's residual functional capacity. However, the court would direct defendant to consider these issues as raised by plaintiff when further administrative proceedings are conducted.

Scope of remand

Plaintiff asks the court to remand this matter for payment of benefits. Whether to remand for additional fact-finding or for an immediate award of benefits is within the discretion of the court.

<u>Birkinshaw v. Astrue</u>, 490 F.Supp.2d 1136, 1147 (D.Kan. 2007). The court is unconvinced that a remand for additional factfinding would not serve a useful purpose. After careful consideration, the court shall remand this case for further proceedings in accordance with this opinion.

V.   CONCLUSION

The court finds that defendant's decision to deny benefits should be reversed and that judgment be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) remanding this case to defendant for further proceedings in accordance with this opinion.

**IT IS SO ORDERED.**

Dated this 8th day of November, 2010 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge